205 N.J. Super. 291 (1984)
500 A.2d 767
COUNTRYSIDE PROPERTIES, INC., A NEW JERSEY CORPORATION AND WALLACE AND CZURA LAND CO., A NEW JERSEY PARTNERSHIP, PLAINTIFFS, AND BUILDERS ASSOCIATION OF NORTHERN NEW JERSEY, PLAINTIFF-INTERVENOR,
v.
MAYOR AND COUNCIL OF THE BOROUGH OF RINGWOOD AND PLANNING BOARD OF THE BOROUGH OF RINGWOOD, DEFENDANTS, AND COALITION OF CONCERNED HOMEOWNERS OF RINGWOOD, INC., DEFENDANT-INTERVENOR.
Superior Court of New Jersey, Law Division Passaic County/Middlesex County.
Decided July 25, 1984.
*293 Gregory J. Czura for plaintiffs.
Lawrence D. Katz for defendants (Diamond, Afflitto & Raimondi, attorneys).
Bernard A. Schwartz for plaintiff-intervenor.
Kurt E. Johnson for defendant-intervenor.
SKILLMAN, J.S.C.
This is a suit by a developer, Countryside Properties, Inc. (Countryside), challenging the zoning ordinance of the Borough of Ringwood (Ringwood) on the grounds that it fails to provide a realistic opportunity for the construction of low and moderate income housing as required by the Mount Laurel doctrine. Southern Burlington Cty. N.A.A.C.P. v. Mount Laurel Tp., 92 N.J. 158 (1983) (Mount Laurel II.)
Ringwood is located in northern Passaic County, bordered to the north by New York State, to the west by West Milford, to the south by Bloomingdale and Wanaque and to the east by Mahwah and Oaklyn. It occupies 27.3 square miles and has a population of 12,625 persons. Its dominant physical features are mountainous terrain and numerous lakes and other bodies *294 of water including the Wanaque Reservoir and the proposed Montville Reservoir. It also contains substantial state parklands including Skylands Manor State Park, Ringwood Manor State Park and Norvin Green State Forest.
Ringwood is in the Skylands Region, which is described in the State Development Guide Plan (SDGP) as a "rugged area" that should be "considered as a significant resource to be appropriately managed and conserved by the State." Division of State & Regional Planning, New Jersey Department of Community Affairs, State Development Guide Plan 67 (1980). Accordingly, the SDGP designates the Skylands Region, including all of Ringwood, as a "conservation area."
This designation determines the nature of Ringwood's obligation with respect to lower income housing, since the Court in Mount Laurel II held that only municipalities located in areas designated "growth" in the SDGP are obligated to provide their fair share of the regional need for lower income housing. Mount Laurel II at 223-248. Municipalities located outside any "growth area" are only obligated to accommodate the present need for lower income housing generated within the municipality. Id. at 244.
As permitted by Mount Laurel II at 239-242, Countryside attacked the "conservation" designation of Ringwood on the grounds, first, that it was "arbitrary and capricious," and second, that there had been a substantial transformation of Ringwood since preparation of the SDGP. Countryside's attack upon the "conservation" designation of Ringwood was rejected by oral opinion after a trial limited to this issue. Therefore, Ringwood's Mount Laurel obligation is limited to its present indigenous need.[1]
*295 There are three issues now before the court. First, what is the present indigenous need of Ringwood? Second, is Ringwood entitled to deduct from that need any credits for its past activities relating to lower income housing? Third, do the current land use regulations of Ringwood provide a realistic opportunity for satisfaction of its present indigenous need?

I
It is necessary at the outset to determine what the Supreme Court intended to be encompassed by present indigenous need; specifically, whether that need is limited to dilapidated units occupied by lower income persons or also extends to physically adequate units which are overcrowded.[2] It is the view of some commentators, e.g. Center for Urban Policy Research, Rutgers-The State University of New Jersey, Mount Laurel II: Challenge & Delivery of Low-Cost Housing at 111-114 (1983) (hereinafter Rutgers Report), and at least one expert witness at trial that overcrowded housing units, while one indicator in combination with others of physical dilapidation, are not by themselves a separate category of present housing need. However, the Court appears to have rejected this view. Although the Mount Laurel II opinion states at one point that the present need obligation relates to "resident poor who now occupy dilapidated housing," Id. at 214, it describes this need at another point as being generated by "present dilapidated or overcrowded lower income units." Id. at 243; emphasis supplied. It is unlikely that the Court's reference, in the disjunctive, *296 to "dilapidated or overcrowded" units was inadvertent. Therefore, the Court appears to have concluded that present indigenous need includes not only housing units occupied by lower income persons which are dilapidated but also units which are physically adequate but overcrowded.
Every expert testifying at this trial (and also in all other pending Mount Laurel litigation) agrees that it is not generally feasible to physically survey all housing units in a municipality or area to determine how many are dilapidated or overcrowded. Special questionnaires mailed to residents are also generally unreliable due to the large number of addressees who fail to respond and the inherent difficulties of following up when there is no response.
The experts also agree that the best source of data from which to determine the number of deficient housing units occupied by lower income persons is the United States Census. The 1980 census did not directly measure housing dilapidation either by physical survey or by questionnaire. However, it did include a number of questions relating to the physical characteristics of housing units and the personal circumstances of the occupants. These questions generated data relating to seven negative characteristics of housing  whether the unit was built prior to 1940, is occupied by more than 1.01 persons per room, permits access only by entering through another dwelling, lacks plumbing facilities for the exclusive use of the occupants, lacks complete kitchen facilities, lacks centralized heating facilities, or lacks an elevator if located in a more than four-story structure. See Rutgers Report at 111.
It should be emphasized that none of this census data directly measures housing dilapidation. A house may lack centralized heating or complete kitchen facilities and yet be structurally sound and possess the other qualities of satisfactory housing. Conversely, a housing unit may not exhibit any negative characteristic revealed by the census data and yet have broken windows and doors, a failed roof and a collapsing exterior structure, *297 and hence be dilapidated. Nonetheless, the experts agree that there is some degree of correlation between the negative characteristics of housing recorded by the census and actual physical dilapidation. Accordingly, these negative characteristics are referred to as "indicators" or "surrogates" of dilapidation.
The area of disagreement among the experts, and the primary subject of testimony at trial, concerns which census data should be used and how it should be taken into account in determining the number of deficient housing units occupied by lower income persons.
Countyside's expert, Carl Hintz, a licensed planner, based his determination of Ringwood's present housing need on a methodology which evolved out of discussions among a group of planners relating to settlement of other Mount Laurel litigation (referred to hereinafter as the Urban League methodology). This methodology relied upon three surrogates of housing deficiencies  lack of complete plumbing (absence of toilet, sink or bathing facilities for exclusive use of residents of unit), overcrowding (1.01 or more occupants per room) and lack of central heating (either no heating, room heaters with no flues or heating by fireplace or stove). Any overlap between these three indicators was eliminated to generate the total number of deficient units in the municipality. These calculations revealed 10 housing units in Ringwood which lacked plumbing for exclusive use, 69 which were overcrowded and 63.49 which lacked adequate heating, for a total of 142.49 deficient units. To determine what percentage of these units were occupied by lower income households, he referred to a 1978 report published by the Tri-State Regional Planning Commission, entitled People, Dwellings & Neighborhoods (hereinafter Tri-State Report), which reported that 82% of inadequate housing units are occupied by lower income households. Accordingly, he concluded that there were 117 deficient housing units in Ringwood (82% x 142.49) which are occupied by lower income persons.
*298 The first of two experts testifying on behalf of Ringwood, Malcolm Kasler, also a licensed planner, expressed the opinion that only the first two Urban League surrogates, that is, lack of plumbing for exclusive use and overcrowding, should be used. The rationale for Kasler's approach was that the Rutgers Report is the most reliable study of the total present need for the State. This report indicates that there is a total present need for the State of 120,160 units, whereas the Urban League methodology would translate into a total statewide need of 158,224.[3] He concluded from this analysis that the Urban League methodology generated an inflated estimate of present need. On the other hand, use of the two surrogate formulas advocated by Kasler generates a statewide total present need of 124,914, which is only slightly more than that generated by the formula employed in the Rutgers Report. Use of his approach leads to the conclusion that there is a present indigenous need of 79 in Ringwood.
The second expert presented by Ringwood was Dr. Robert Burchell, one of the co-authors of the Rutgers Report. Burchell, who appeared without compensation, testified that the Rutgers Report was the result of four months of research and analysis by six researchers at Rutgers' Center for Urban Policy Research, or a total of two man-years of research work, which was jointly funded by the New Jersey State League of Municipalities and the New Jersey Builders Association. The objective of their work was not to produce a methodology for determining the fair share obligation of individual municipalities but rather to study the magnitude and nature of the lower income housing problem on a regional and statewide basis.
The Rutgers Report uses the seven surrogates generated by questions asked in the 1980 census discussed previously. Ante at 297; Rutgers Report at 108-114. However, the methodology *299 requires at least two of the deficiencies to be present for a unit to be considered dilapidated. The basic rationale for this approach is that by broadening the number of surrogates taken into account and at the same time requiring the presence of multiple surrogates for a unit to be designated dilapidated, a more accurate indication of dilapidated units is achieved than by methodologies which recognize a single surrogate as signaling housing dilapidation. Rutgers Report at 102-114, 141-151. The Rutgers Report refers to a study performed by the census, Id. at 147-149, as well as its own cross tabulations of data, Id. at 141-147, to support its methodology for identifying the extent of dilapidated housing units in New Jersey. Applying this methodology, there are 190,500 dilapidated units in New Jersey, of which 120,160 are occupied by lower income persons. Id. at 142.
The source of data on deficient housing occupied by lower income persons used in the Rutgers Report was the New Jersey Public Use sample. This is a five percent sample of all households in New Jersey taken by the United States Census Bureau. All information for this population sample is recorded on computer tape. Therefore, it is possible to determine by computer run what number of households occupy housing that is deficient according to the Rutgers criteria. It is also possible to identify the household size and income levels of the families occupying these units to establish what number are lower income and to eliminate any double counting of units.
Dr. Burchell testified that the data from the Public Use sample is not generally available at the municipal level. The smallest area encompassing Ringwood for which the data is available is western Passaic County, i.e., all municipalities in Passaic County except Paterson, Clifton and Passaic. A computer run for this subregion revealed that there are 1,740 deficient housing units, of which 1,020, or 58.6%, are occupied by lower income persons.
*300 The final step in Burchell's analysis was to allocate a percentage of the subregional present need to Ringwood. After determining that the median per capita income of Ringwood is typical of the subregion, he concluded that it would be appropriate to allocate to Ringwood the same proportion of present need as its population bears to the total population of the subregion, which is 6%. This leads to the conclusion that the present indigenous need of Ringwood is 61.
This court is convinced that the Rutgers Report represents the most sophisticated and reliable methodology for determining the extent of lower income persons occupying deficient housing. The broadbased multi-surrogate designation of deficient housing permits a more precise identification of present need than either the Urban League or Kasler methodologies. By taking into account all the negative characteristics of housing counted in the 1980 census, but at the same time requiring the presence of two of those characteristics before a unit is designated as deficient, it increases the likelihood that truly deficient units will be identified, while minimizing the count of satisfactory units which may exhibit a single negative characteristic. Most important, the Rutgers methodology makes it possible to specifically identify the household size and income level of the occupants of deficient units and thereby to specify the number of deficient units occupied by lower income persons.
The most serious weakness in the Urban League methodology is its assumption that 82% of the housing units designated as deficient are occupied by lower income persons. This number is derived from a single sentence in a 1978 report of the Tri-State Regional Planning Commission, which reads as follows: "3 Low and Moderate Incomes. This includes one-third of all households, and it also includes almost all 82 percent of the households experiencing inadequate housing conditions." Tri-State Report at 15. The report contains no indication of how the "82%" figure was established. Furthermore, since the *301 Tri-State Commission has been dissolved, it has not been possible to locate any person or background document which might reveal the source of this statistic.
While the specific source of the "82%" figure has not been determined, an overall review of the Tri-State Report indicates that there are a number of problems in using the data contained therein to determine the income levels of New Jersey residents occupying deficient housing. First, the study encompassed the entire New York metropolitan area, including the Connecticut and New York suburbs and New York City. Consequently, the size of New York City's population causes its housing characteristics to dominate the statistics. Second, the primary source of data appears to have been the 1970 census, which is now 14 years old. Third, the term "inadequate" housing in the sentence from which the "82%" figure is derived may have included not only physically deficient and overcrowded units but also units occupied by persons who pay a disproportionate percentage of income for housing or who commute an excessive distance to work. See Tri-State Report at 8. Since neither the Urban League nor the Rutgers methodologies include the latter two categories of housing units as part of present need, this is yet another reason to conclude that the "82%" statistic is unreliable.
The Rutgers methodology for determining the percentage of deficient units occupied by lower income persons has none of the weaknesses of the Tri-State Report statistic. The source of the Rutgers data is computer runs that were introduced into evidence and the accuracy of which was not questioned. The data relates solely to northern Passaic County, not the entire New York metropolitan area, and its source is the 1980, not the 1970, census. Most important, the computer runs separately link each housing unit found to be deficient with the income level and household size of its occupants to arrive at the precise breakdown of deficient units occupied by lower income persons.
*302 Although the conclusion of the Rutgers study that 41.4% of deficient housing units are occupied by non-lower income persons may appear somewhat surprising at first, there are several possible explanations for this phenomenon. First, there is great diversity in consumer preferences. Some persons with sufficient resources to obtain adequate housing may choose to spend their money in other ways. Second, it must be kept in mind that all of the methodologies, including the Rutgers' methodology, use surrogates of housing deficiency rather than directly counting deficient units. The Rutgers Report concludes that the high percentage of non-lower income persons occupying units which are signaled as being deficient suggests that the Rutgers surrogates are overstating the true extent of deficient housing. See Rutgers Report at 141-149.
It also should be noted that Dr. Burchell checked the results for the Ringwood subregion generated by the Rutgers methodology by conducting a computer run for this same subregion using the Urban League surrogates for housing deficiency. This showed that there were 1,060 deficient units occupied by lower income persons as determined by a precise computer run of the actual occupants of deficient units, as defined by the Urban League methodology, rather than use of the "82%" figure. This present need number was only 40 units more than the subregional present need number of 1,020 determined by using the Rutgers methodology. However, it was 840 units less than the 1,900 unit present need number for the subregion generated by using the Urban League methodology and applying the "82%" figure from the Tri-State Report. It is also noteworthy that this computer run showed that 54.3% of the units signaled as being deficient by the Urban League methodology are occupied by non-lower income persons. Therefore, to the extent that occupancy by non-lower income persons suggests that surrogates are overcounting the actual number of deficient units, Burchell's analysis would indicate that the Urban *303 League methodology is overcounting such units to a greater extent than the Rutgers methodology.
In sum, this court is satisfied that the seven-surrogate methodology employed by the Rutgers Report, with its requirement of the presence of at least two surrogates to identify a housing unit as deficient, is more reliable than the three-surrogate approach of Urban League. It is also satisfied that the Rutgers methodology provides a far more reliable indication of the percentage of deficient units occupied by lower income persons.[4]
The one significant disadvantage with the Rutgers methodology is that the computer tapes it uses are generally available only at the subregional level. The question is whether there is a reasonably reliable method for converting the data generated by these tapes from the subregional to the municipal level.
After first determining that Ringwood's median household income is near the average for the subregion, Burchell simply allocated to Ringwood the percentage of the total subregional need which corresponds with its percentage of subregional households. The weakness with this approach is that it assumes a direct correlation between a municipality's percentage of households in the subregion and the percentage which are deficient and occupied by lower income persons. However, such a direct correlation cannot be established by empirical *304 evidence, and its validity appears dubious. It seems plausible that a municipality may be populated by all middle income persons occupying adequate housing, whereas a neighboring municipality with the same population and the same median household income may have a significant pocket of lower income persons residing in dilapidated housing. Yet Burchell's approach would assume that each of these municipalities has the same present indigenous need.
There is a more reliable method for allocating the total subregional present need, as determined by the Rutgers methodology, to an individual municipality, such as Ringwood. Although it has been concluded that the Rutgers methodology is more reliable overall than the Urban League methodology for determining the total number of deficient units occupied by lower income persons, the Urban League methodology provides an appropriate means for converting subregional results to the municipal level. Specifically, it is possible to determine, using the Urban League methodology, what percentage of subregional present need is located in Ringwood
 142.49
 (i.e., ______ = 6.15%)
 2317
and to apply that figure to the total present subregional need as determined by the Rutgers methodology to arrive at a present indigenous need for Ringwood of 63 (i.e., 6.15% x 1020). One virtue of this approach is that it avoids any reliance upon the "82%" figure derived from the Tri-State Report by starting with the total subregional need of 1,020 units as determined by the Rutgers Report. A second virtue is that it uses negative housing characteristics as reflected by the census, i.e., the three Urban League surrogates, rather than simply the percentage of total households in the subregion as suggested by Burchell, in determining what percentage of total subregional need to allocate to an individual municipality such as Ringwood.
*305 There is one further calculation that must be made to establish Ringwood's indigenous need. As indicated in the first paragraph of this discussion, total indigenous need includes not only dilapidated but also overcrowded units. However, the Rutgers Report treats overcrowding as simply a surrogate for dilapidation and requires the presence of at least one other surrogate to count a unit as dilapidated.[5] Therefore, it is necessary to add to the Rutgers calculation of present need any overcrowded units constructed after 1940 that do not have any other characteristics of dilapidation. This number is easily ascertainable and should be provided to the court and to opposing counsel by Ringwood within 15 days so that a final calculation of present indigenous need can be made.

II
Ringwood claims that it is entitled to a credit against its present indigenous need number for its past efforts to rehabilitate housing in what is called Upper Ringwood, which is an old mining area occupied by impoverished whites, blacks, and native Americans, called the Ramapo Mountain People, who settled there before the Revolutionary War. In support of this claim, Ringwood has submitted an affidavit from its land use administrator, Barbara Walsh, which details its activities taken to rehabilitate the admittedly dilapidated housing in Upper Ringwood. These activities included the construction of 15 new dwelling units, and the rehabilitation of 40 other units, which included the installation of electrical systems, the installation of bathrooms and septic systems, water main improvements, repair and/or replacement of doors and windows and the installation of new roofs.
*306 Although all these efforts are highly commendable, they cannot provide the basis for Ringwood claiming a credit against its indigenous need obligation. It was stipulated that nothing has been done in the Upper Ringwood area since the 1980 census relating to heating, plumbing or overcrowding. Therefore, all new construction or rehabilitation was completed in the 1970s and should be reflected in the 1980 census. To the extent that work transformed dilapidated housing units into a satisfactory condition, Ringwood would have received credit through the 1980 census indicating a lower indigenous need than if the work had not been performed. On the other hand, if some of these units remain dilapidated despite Ringwood's efforts at rehabilitation, those units should be counted as part of its indigenous need to be met either through rezoning or further efforts at rehabilitation. Furthermore, to the extent Ringwood's rehabilitation efforts may have corrected physical deficiencies in Upper Ringwood housing units which nonetheless remain overcrowded, the Court in Mount Laurel II seems to have said, as discussed ante at 296, that those units should continue to be viewed as deficient and hence are a component of present need. Therefore, recognition of the credits sought by Ringwood would have the practical effect of conferring duplicate credit upon Ringwood for its rehabilitation efforts and establishing a Mount Laurel obligation that would be less than Ringwood's actual indigenous need. This would be contrary to the mandate of Mount Laurel II and consequently must be rejected.

III
The only area in which Ringwood contends there is a realistic opportunity for the construction of lower income housing is the "RT-40" district. All the land in this district, which consists of 150 acres located in Upper Ringwood, is owned by Ringwood and is zoned for single and two-family houses.
*307 Countryside's expert, Hintz, testified that the "RT-40" zoning does not provide any realistic opportunity for the construction of lower income housing, because it imposes excessive minimum lot size (40,000 square feet) and setback (35 foot frontyard and 30 foot sideyard) requirements. Furthermore, it contains no provisions designed to encourage the construction of lower income housing, such as density bonuses, mandatory set-asides or authorization for the construction of mobile homes.
Ringwood did not present any evidence to dispute Hintz' analysis and thereby in effect conceded that the zoning in the "RT-40" district does not on its face provide a realistic opportunity for the construction of lower income housing. Rather, Ringwood argues that it can overcome the obstacles to the construction of lower income housing posed by the ordinance because it owns all the land in this district and could convey it to a potential developer at little or no cost. However, Ringwood presented no evidence demonstrating that housing which can be built subject to the requirements in the "RT-40" zone would be affordable to lower income persons even if the land were conveyed free to a developer. Even more significant, no evidence was presented of any specific development plans for this municipally-owned land. Therefore, whatever potential this land may offer for satisfying Ringwood's Mount Laurel obligation, a speculative possibility of future compliance with Mount Laurel is insufficient to establish that the present zoning ordinance provides a realistic opportunity for the construction of lower income housing.
For these reasons, Ringwood's zoning ordinance is invalid under Mount Laurel II. A new ordinance, which provides a realistic opportunity for lower income housing, must be adopted within 90 days and submitted to the court for review. Mount Laurel II at 281. It will be determined at the same time whether a builder's remedy should be awarded to Countryside.
NOTES
[1] Countryside argues that since Ringwood allegedly has had exclusionary zoning in the past its Mount Laurel obligation should be expanded to equal the same percentage of total deficient housing occupied by lower income persons in the region as its percentage of the total population of the region. However, the imposition of such an obligation would be flatly inconsistent with Mount Laurel II, which limits the Mount Laurel obligation of a municipality located wholly outside any "growth area" to its indigenous lower income persons who occupy deficient housing, irrespective of whether that municipality has had exclusionary zoning. See Mount Laurel II at 244.
[2] Countryside does not make the argument, rejected by this court in another case, that present need also includes families who are residing in housing which is physically adequate and not overcrowded but who are paying an excessive percentage of their income for that housing.
[3] Kasler's number did not completely eliminate the overlap between the different Urban League surrogates. The actual statewide total present need generated by the Urban League methodology is a little less than 150,000.
[4] The testimony at trial revealed that it is relatively easy and inexpensive to perform the computer runs required by the Rutgers methodology. However, this does not mean that the parties to a Mount Laurel case are compelled to perform such computer runs. Rather, the Urban League methodology seems to provide a sufficiently reliable means of identifying deficient units if the parties choose not to use the computer data made available through the Public Use Sample. On the other hand, the weaknesses discussed in this opinion of the "82%" figure derived from the Tri-State Report suggests that a more reliable indicator of the percentage of deficient units occupied by lower income persons should be used in conjunction with the Urban League methodology, such as, for example, the statewide and regional statistics found at page 142 of the Rutgers Report.
[5] It is not clear whether Hintz and Kasler view overcrowding as simply a surrogate for dilapidation or an independent standard of housing inadequacy. In any event, this question would be of only academic interest under their methodologies, since the presence of a single surrogate is sufficient to designate a unit as deficient.